**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

DONALD R. E.,[1]                                    **6:19-cv-01537-BR**

          **Plaintiff,**                            **OPINION AND ORDER**

**v.**

**COMMISSIONER, SOCIAL**
**SECURITY ADMINISTRATION,**

          **Defendant.**

**KATHERINE EITENMILLER**
**MARK A. MANNING**
Harder Wells Baron & Manning
474 Willamette Street
Eugene, OR 97401
(541) 686-1969

          Attorneys for Plaintiff

**BILLY J. WILLIAMS**
United States Attorney
**RENATA GOWIE**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1021

_____

          [1] In the interest of privacy this Court uses only the first
name and the initial of the last name of the nongovernmental
party in this case.

1 - OPINION AND ORDER

**MICHAEL W. PILE**
Acting Regional Chief Counsel
**FREDERICK D. FRIPPS**
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104
(206) 615-3892

       Attorneys for Defendant

**BROWN, Senior Judge.**

    Plaintiff Donald R. E. seeks judicial review of a final decision of the Commissioner of the Social Security Administration (SSA) in which he denied Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

    For the reasons that follow, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.

## ADMINISTRATIVE HISTORY

    Plaintiff filed an application for DIB on July 14, 2016, alleging a disability onset date of February 28, 2015.  Tr. 188.[2] The application was denied initially and on reconsideration.  An Administrative Law Judge (ALJ) held a hearing on August 9, 2018. Tr. 63-83.  Plaintiff was represented at the hearing.  Plaintiff

---

    [2] Citations to the official transcript of record filed by the Commissioner on March 13, 2020, are referred to as "Tr."

2 - OPINION AND ORDER

and a vocational expert (VE) testified.

The ALJ issued a decision on October 25, 2018, in which she found Plaintiff is not disabled and, therefore, is not entitled to benefits.  Tr. 13-26.  Pursuant to 20 C.F.R. § 404.984(d), that decision became the final decision of the Commissioner on August 5, 2019, when the Appeals Council denied Plaintiff's request for review.  Tr. 1-6.  *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

## BACKGROUND

Plaintiff was born on March 12, 1983, and was 35 years old at the time of the hearing.  Tr. 188.  Plaintiff graduated from high school.  Tr. 208.  Plaintiff has past relevant work experience as a security guard, tractor-trailer driver, police officer, stock clerk, janitor, and heavy-equipment operator. Tr. 24-25.

Plaintiff alleges disability during the relevant period due to post-traumatic stress disorder (PTSD); panic attacks; depression; insomnia; back, neck, and shoulder injuries; migraines; and arthritis.  Tr. 85-86.

Except when noted, Plaintiff does not challenge the ALJ's summary of the medical evidence.  After carefully reviewing the medical records, this Court adopts the ALJ's summary of the medical evidence.  *See* Tr. 20-23.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). "It is more than a mere scintilla [of evidence] but less than a preponderance." *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## DISABILITY ANALYSIS

### I.    The Regulatory Sequential Evaluation

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). *See also* 20 C.F.R. § 404.1520. Each step is potentially dispositive.

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). *See also Keyser v.*

*Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(iii).  *See also Keyser*, 648 F.3d at 724.  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, he must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. § 404.1520(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."  SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885

F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv). *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, he must determine whether the claimant is able to do any other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). *See also Keyser*, 648 F.3d at 724-25. Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform. *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

## **ALJ'S FINDINGS**

At Step One the ALJ found Plaintiff has not engaged in substantial gainful activity since his February 28, 2015, alleged onset date. Tr. 15.

At Step Two the ALJ found Plaintiff has the severe impairments of "cervical strain with minimal degenerative disc

disease," lumbar degenerative disc disease, "lumbago with
sciatica, right carpal tunnel syndrome status-post release, right
shoulder rotator cuff tear with minor degenerative joint
disease," anxiety, PTSD, obstructive sleep apnea, and obesity.
Tr. 15.  The ALJ found Plaintiff's impairments of left-knee pain
and hypouricemia are not severe and Plaintiff's insomnia "is
a symptom of his anxiety and not a distinct impairment."
Tr. 15-16.

At Step Three the ALJ concluded Plaintiff's medically
determinable impairments do not meet or medically equal one of
the listed impairments in 20 C.F.R. part 404, subpart P, appendix
1.  Tr. 16.  The ALJ found Plaintiff has the RFC to perform light
work with the following limitations:

> [Plaintiff] can lift and carry 20 pounds
> occasionally and 10 pounds frequent [*sic*].  He can
> stand and/or walk for approximately 6 hours and
> sit for approximately 6 hours, in an 8-hour
> workday, with normal breaks.  He cannot climb
> ladders, ropes, or scaffolds and can frequently
> climb of stairs and ramps.  He can frequently
> stoop, kneel, and crouch.  [Plaintiff] can
> occasionally crawl and reach overhead bilaterally.
> He can frequently handle and finger with the right
> upper extremity.  He can have no exposure to
> moving mechanical parts and high, unprotected
> places [or] hazards and occasional exposure to
> extreme cold and vibrations, all as rated by the
> DOT.  He is limited to understanding, remembering,
> and carrying out uninvolved and routine
> instructions that require only occasional
> predictable variations from standard procedures
> (consistent with reasoning level 2).  He can
> perform isolated work, defined as having no public
> contact, occasional direct coworker interaction
> and no group tasks (no limitation on incidental

> coworker contact), and occasional supervisor
> contact.  He should perform a low stress job,
> defined as requiring only occasional changes in
> work setting and work duties and no conveyor belt
> pace work.

Tr. 18.

At Step Four the ALJ found Plaintiff cannot perform his past relevant work.  Tr. 24.

At Step Five the ALJ found Plaintiff can perform other work that exists in the national economy.  Tr. 26.  Accordingly, the ALJ concluded Plaintiff is not disabled.  Tr. 27.

## DISCUSSION

Plaintiff contends the ALJ erred when she (1) partially rejected Plaintiff's testimony; (2) partially rejected the opinion of Jan Harrell, Ph.D., examining psychologist; (3) partially rejected the opinions of Susan Aviotti, L.P.C., treating counselor; and (4) gave less than "great weight" to the Veteran's Administration (VA) determination that Plaintiff is disabled.

## I.  The ALJ did not err when she partially rejected Plaintiff's testimony.

Plaintiff alleges the ALJ erred when she partially rejected Plaintiff's testimony.

The ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.

9 - OPINION AND ORDER

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014)(quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  The claimant need not show his "impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).  A claimant is not required to produce "objective medical evidence of the pain or fatigue itself, or the severity thereof." *Garrison*, 759 F.3d at 1014.

If the claimant satisfies the first step of this analysis and there is not any affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014-15.  *See also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (same).  General assertions that the claimant's testimony is not credible are insufficient.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).  The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

In his August 14, 2016, Function Report Plaintiff noted he was unable to work due to back and shoulder injuries; "tennitis"; and PTSD, which "affects [his] interactions with other people, [his] ability to focus, and [his ability to] feel safe." Tr. 216.  Plaintiff stated he has nightmares and insomnia. Plaintiff noted he often watches television and plays video games and "rarely" plays sports or goes hunting.  Plaintiff also stated he is able to prepare sandwiches and frozen foods, to do light house work, and to shop for food and clothing in stores and by computer.  Plaintiff is able to spend time with family, therapists, and other individuals in group therapy, but he has "problems getting along with . . . hippies, liberals, democrats, idiots, [and] criminals."  Tr. 221.  Plaintiff stated he can walk for 20 feet before he has to rest for "a couple minutes" and can pay attention for five minutes.  Tr. 221.  Plaintiff noted he follows written instructions "well"; follows spoken instructions "okay"; gets along "well" with "authority figures (for example, police, bosses, landlords, or teachers)"; and has never been fired from a job "because of problems getting along with other people."  Tr. 221.  Plaintiff handles stress and changes in routine "poorly."  Tr. 221.  Plaintiff reported he is afraid of "strange people, must sit facing the door to leave, [and] check[s] for shooters/bombers."  Tr. 222.

Plaintiff testified at the hearing that he quit his last job

11 - OPINION AND ORDER

as one of the security personnel at a casino in February 2015 at
the request of his wife because he was "having a breakdown. [He]
constantly was fighting with everybody. [He] wasn't sleeping.
[He] was falling asleep behind the wheel. [He] had anxiety
attacks going to work. [His wife] just had enough of watching
[him] do that. She very forcefully told [him that he] needed to
stop doing that. [He] was very destructive. Even at work [he]
wasn't really functioning." Tr. 69. Plaintiff stated he also
had problems at the truck-driving job he had before his security
job. Specifically, Plaintiff had "difficulty with other drivers
on the road and toll workers. . . . They threatened to fire me
several times because I was not very cooperative." Tr. 69.
Plaintiff explained:

> They wanted me to team up with other drivers. I
> didn't get along with other drivers. I couldn't
> match up with anybody so I couldn't share my
> space. I was ineffective on the road[,] stopped a
> lot and teaming up with someone wasn't good for me
> or that other person.

Tr. 70. Plaintiff testified his primary impediment to working is
that he has "difficulty working around crowds of people. [He]
shut[s] down." Tr. 70. For example, Plaintiff stated he worked
the graveyard shift when he had his security job.

> For the first 2-3 hours, I was usually in the
> office. I was out of the way. I would be on the
> floor for a few minutes and then I'd be right back
> off the floor. If the casino was pretty much
> empty, I could actually get out and walk around.
> That job was walking around for 30 minutes and
> sit[ting] down for [a] half hour. Even with a

> little bit of interaction, I was just stressed out
> all the time.  My interactions weren't a very good
> environment. . . .  I would have to have the
> supervisor constantly keeping me on track.
> Luckily for me, he was a former police officer and
> he had a soft spot for me.  So he wasn't
> constantly on me.  He would guide me.  But there
> were always parts he would have to fill in for me,
> stuff I should have been able to do, stuff that I
> was very capable of doing before.

Tr. 71.  Plaintiff, however, noted "[w]hen [he] was working as a

farmhand, they gave [him] very basic jobs, things that someone

wouldn't have to think about.  [He] would just do it.  [He] was

working at simple, simple projects and [he] couldn't come up with

solution of things."  Tr. 71.

Plaintiff testified he goes to the VA for group therapy

"periodically" to get out of the house.  Plaintiff stated he

spends "all day every day in the house.  [He] do[es not] go out.

It's hard to get out.  [His] wife will drag [him] out to go

grocery shopping with her to get [him] out of the house."

Tr. 73.  Plaintiff stated he can shop at Walmart "[i]f [he]

get[s] one object, that one thing [he] need[s] to get, [he] can

go straight in and come back out.  [He is] usually okay, but if

[he] ha[s] to spend periods of time, [he] can't."  Tr. 73.

Plaintiff testified his other "biggest issue" keeping him

from working is focus.  "When people talk to [him] for long

periods of time, [he] do[es not] hear a lot of what they're

saying.  [He] . . . can't focus on what's going on.  [He] ha[s]

flashbacks where [he] go[es] back to some of [his] buddies in

13 - OPINION AND ORDER

Iraq.  [He] can't function at all."  Tr. 72.  Plaintiff explained
he had flashbacks two or three times a week before he began
attending "PTSD meetings and [became] aware of what's actually
going on."  Tr. 72.  Plaintiff noted his flashbacks were "not
nearly as frequent" at the time of the hearing due to PTSD group
meetings and counseling.  Plaintiff stated he has made "dramatic
strides.  A couple of years ago, [he] wouldn't have been able to
walk into the social security office, but now [he] can.  It's a
lot of improvement."  Tr. 73.

     Plaintiff testified his usual day consists of helping his
wife "get out to work," eating cereal, watching television,
"interact[ing] with [his] girls a little bit," and "try[ing] to
help somebody in the house" if they need something.  Tr. 74.
Plaintiff stated he does not get out of the house for social
activities, and he does not participate in any of his children's
activities.  Plaintiff stated he has tried to go to his son's
football games, but "there are just too many people.  People
always want to come up and talk and want to stand by me.  If I
can stay back in the distance and stay away from the crowds of
people, I'm okay."  Tr. 68.

     The ALJ found Plaintiff's "medically determinable
impairments could reasonably be expected to cause some of the
alleged symptoms," but Plaintiff's "statements concerning the
intensity, persistence and limiting effects of [his] symptoms are

not entirely consistent with the medical evidence and other
evidence in the record." Tr. 20.  Specifically, the ALJ noted
Plaintiff testified he does not participate in any of his
children's activities.  For example, Plaintiff stated he has
tried to go to his son's football games, but "there are just too
many people." Tr. 68.  In August 2017, however, Plaintiff
reported to Rory Austin, N.P., treating mental-health nurse
practitioner, that he "is usually reclusive in the summers, but
comes out of his shell in the school year with activities for his
kids." Tr. 796.  N.P. Austin recommended Plaintiff return in six
weeks because she believed Plaintiff's "reclusiveness" might
"resolve when he gets more involved in sports with kids and
school activities." Tr. 797.

        The ALJ also noted Plaintiff testified he spends "all day
every day in the house," his wife has to "drag" him out to do
grocery shopping, he cannot spend any time in the grocery store,
and he has difficulty with crowds of people.  On May 9, 2018,
however, Plaintiff reported in group therapy that he "was
traveling in Las Vegas and saw USO shows and [a] Toby Keith
[concert]." Tr. 851.

        In addition, the ALJ pointed out that Plaintiff testified he
left his job as a casino security officer in February 2015
because he was "having a breakdown[,] . . . constantly was
fighting with everybody[,] . . . wasn't sleeping[,] . . . was

falling asleep behind the wheel[,] . . . had anxiety attacks
going to work[, and] . . . wasn't really functioning." Tr. 69.
The ALJ pointed out that the record reflects Plaintiff was not
undergoing mental-health treatment from January 2015 through May
2015, and on May 5, 2015, Plaintiff reported to Amy Bodreau,
M.D., Ph.D., treating psychiatrist, that his "anxiety [was] in
remission [and he was] coping with his father's illness well."
Tr. 408. Dr. Bodreau transferred Plaintiff's care back to his
primary-care physician and "invited [him to return] at any point
in the future if [his] sx worsen." Tr. 408.

Plaintiff did not report for mental-health treatment again
until November 2015. The ALJ noted on November 12, 2015,
Plaintiff reported to Stacy Johnson, L.P.C., treating counselor,
that he stopped working at the casino "due to disability related
to back issues as well as chronic pain." Tr. 393. Plaintiff
stated he was "the primary caregiver of his children and [a]
homemaker" and "denied recent [and historic] aggression towards
persons, animals, or property." Tr. 393. Johnson conducted a
review of Plaintiff's ability to perform 20 activities of daily
living. Johnson found Plaintiff had mild or "very mild
impairment or problems in functioning" in 14 areas including
family relationships, problem solving, communications, leisure,
social network, coping skills, and "behavioral norms." Tr. 395.
Plaintiff had moderate impairment in 6 areas: (1) "Managing

Time:  Follows regular schedule for bedtime, wake-up, meal times, rarely tardy or absent for work, day programs, appointments, scheduled activities"; (2) Managing Money:  Manages money wisely. Has an independent source of funds.  Controls spending habits"; (3) "Nutrition:  Eats at least two basically nutritious meals daily"; (4) "Productivity:  Independently working, volunteering, homemaking, or learning skills for financial self support"; (5) "Care for personal cleanliness, such as bathing, brushing teeth": and (6) "Housing maintenance:  Maintains stable housing. Organizes possessions.  Cleans.  Abides by rules and contributes to maintenance if living with others."  Tr. 395.  Plaintiff maintained similar scores on each review throughout November and December 2015 when he stopped attending mental-health treatment. In addition, on November 24, 2015, Plaintiff reported he took a trip to Coos Bay for his wife to go to a job interview and "to visit with family and friends."  Tr. 384.  On December 22, 2015, Plaintiff asked to decrease his number of mental-health appointments, and his counselor agreed "given [Plaintiff's] recent successes with symptom management."  Tr. 373.  On May 31, 2016, Plaintiff was discharged from mental-health treatment because he reported he had achieved all of his goals, and his treatment provider deemed his treatment complete.  Tr. 367.  At that time Plaintiff's mental-health provider noted Plaintiff had only "mild impairment or problems in functioning" in all 20

17 - OPINION AND ORDER

activities of daily living.  Tr. 368.

The ALJ also pointed out that the record reflects Plaintiff's symptoms improved when he consistently underwent therapy and took medication.  For example, on April 13, 2017, Plaintiff reported to N.P. Austin that "quetiapine works well for sleep with no side effects" and he did not have any "side effects from lamotrigine."  Tr. 826.  Plaintiff reported he did not "feel any changes [from lamotrigine], which he likes, but . . . he and his family notice[d] a lot less blow ups."  Tr. 826.  On October 11, 2017, Plaintiff reported to N.P. Austin that "doxepin helps [Plaintiff to] sleep well . . . and prazosin helps reduce nightmares."  Tr. 783.  On March 20, 2018, Plaintiff reported to N.P. Austin that "temazepam works for sleeping 5+ hours[,] . . . prazosin reduce[d] [his] nightmares well[, and] . . . the addition of topiramate worked well and [he] report[ed] he is no longer feeling angry or irritable."  Tr. 699.

The Court concludes on this record that the ALJ did not err when she partially rejected Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms because the ALJ provided clear and convincing reasons supported by substantial evidence in the record for doing so.

## II.  The ALJ did not err when she partially rejected Dr. Harrell's opinion.

Plaintiff asserts the ALJ erred when she partially rejected the opinion of Dr. Harrell, examining psychologist.

An ALJ may reject an examining physician's opinion when it is inconsistent with the opinions of other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002). When the medical opinion of an examining physician is uncontroverted, however, the ALJ must give "clear and convincing reasons" for rejecting it. *Thomas*, 278 F.3d at 957. *See also Lester v. Chater*, 81 F.3d 821, 830-32 (9th Cir. 1996).

On May 12, 2018, Dr. Harrell conducted a telephonic psychological evaluation of Plaintiff. Plaintiff told Dr. Harrell that he is "afraid to be among other people[,] . . . isolates himself at his home[, and] . . . does not seek out company." Tr. 832. Plaintiff also stated he is "constantly in a low level alertness and fearfulness," is "always depressed," "has irritable behavior and anger outburst[s] with little or no provocation," suffers from anxiety, has difficulty falling asleep, has flashbacks, has nightmares, has problems with concentration, and experiences paranoia. Dr. Harrell found Plaintiff suffers from PTSD that "causes clinically significant distress and impairment in social and occupational areas of functioning. . . . Only by being able to seclude himself and radically eliminate all social and societal contacts has he been

able to manage his emotional reactions so that he is not overwhelmed by stimuli and catalysts which trigger more memories and emotions than he can contain or control." Tr. 837-38. Dr. Harrell also stated Plaintiff "suffers from extreme nightmares, barely able to get enough sleep to function during the day," and his daily activities are "severely limited by the intense outbursts of anger that he is unable to control." Tr. 838. Dr. Harrell concluded she did "not believe that much improvement in his adjustment or mental status is possible." Tr. 838.

The ALJ gave Dr. Harrell's opinion "little weight" on the grounds that she did not review Plaintiff's records before the evaluation, the evaluation was conducted over the telephone, she relied solely on Plaintiff's subjective complaints, and her findings are not supported by the record. For example, as noted, on May 9, 2018, which was three days before Dr. Harrell's evaluation, Plaintiff reported he "was traveling in Las Vegas and saw USO shows and [a] Toby Keith [concert]." Tr. 851. The record also reflects on March 20, 2018, Plaintiff reported "temazepam works for sleeping 5+ hours[,] . . . prazosin reduce[d] [his] nightmares well[, and] . . . the addition of topiramate worked well and . . . he is no longer feeling angry or irritable." Tr. 699. Similarly, on May 31, 2016, Plaintiff was discharged from mental-health treatment because he reported he

had achieved all of his goals, and his treatment provider deemed his treatment completed.  Tr. 367.  At that time Plaintiff's mental-health provider noted Plaintiff had only "mild impairment or problems in functioning" in all 20 activities of daily living. Tr. 368.  On April 13, 2017, Plaintiff reported "quetiapine works well for sleep with no side effects" and that he did not have any "side effects from lamotrigine."  Tr. 826.  Plaintiff stated he did not "feel any changes [from lamotrigine], which he likes, but . . . he and his family notice[d] a lot less blow ups."  Tr. 826. On October 11, 2017, Plaintiff reported "doxepin helps [him to] sleep well . . . and prazosin helps reduce nightmares."  Tr. 783.

In *Turner v. Commissioner of Social Security* the Ninth Circuit held an ALJ did not err by partially rejecting the opinion of a treating physician even though that physician "had not had any . . . interaction with the claimant" before offering his opinion and the opinion was "based almost entirely on the claimant's self-reporting . . . without any independent analysis."  613 F.3d 1217, 1223 (9th Cir. 2010).

On this record the Court concludes the ALJ did not err when she partially rejected Dr. Harrell's opinion because the ALJ provided clear and convincing reasons for doing so based on substantial evidence in the record.

**III. The ALJ did not err when she partially rejected the opinions of Susan Aviotti, L.P.C., treating counselor.**

Plaintiff contends the ALJ erred when she partially rejected

the opinions of Susan Aviotti, treating counselor.

Medical sources are divided into two categories: "acceptable" and "not acceptable." 20 C.F.R. § 416.902. Acceptable medical sources include licensed physicians and psychologists. 20 C.F.R. § 416.902. Medical sources classified as "not acceptable" include, but are not limited to, . . . therapists [and] licensed clinical social workers. SSR 06-03p, at *2. Factors the ALJ should consider when determining the weight to give an opinion from those "important" sources include the length of time the source has known the claimant and the number of times and frequency that the source has seen the claimant, the consistency of the source's opinion with other evidence in the record, the relevance of the source's opinion, the quality of the source's explanation of his opinion, and the source's training and expertise. SSR 06-03p, at *4. On the basis of the particular facts and the above factors, the ALJ may assign a not-acceptable medical source either greater or lesser weight than that of an acceptable medical source. SSR 06-03p, at *5-6. The ALJ, however, must explain the weight assigned to such sources to the extent that a claimant or subsequent reviewer may follow the ALJ's reasoning. SSR 06-03p, at *6.

On March 23, 2017, Aviotti provided a letter to the Department of Veterans Affairs in which she stated Plaintiff has PTSD. Aviotti reported Plaintiff "is experiencing anxiety, is

'wound tight,' is depressed, has problems concentrating, has no energy to take on tasks, has a hard time getting going, and has intrusive thoughts." Tr. 624. Plaintiff reported to Aviotti that he "doesn't sleep much, has nightmares, night sweats, rage, anger, high irritability, is cynical and suspicious of others, has a high startle reaction, and is hyper-vigilant." Tr. 624. Plaintiff told Aviotti that he

> had to quit his security night shift job at the Casino because he was losing the ability to be professional and moderate his responses when dealing with trouble makers. Night work was slower and had less people in the Casino but he was overwhelmed with anxiety, sweating, panic attacks. He would become confused and target in on the person with menace in mind.

Tr. 624. Plaintiff also reported he is able to do simple tasks "with a supervisor available," but he is unable to concentrate sufficiently to complete complex tasks. Tr. 624. Plaintiff stated "[a]nything not in place sends him into high alert [and] . . . he reacts with anxious survival techniques when stressed or confronted." Tr. 624. Aviotti stated it was her opinion "that due to the severity of PTSD he should not be in the work force because negative consequences would happen [and] . . . [d]ue to the severity of his PTSD anxiety it is doubtful that he could function in any employment situation." Tr. 624.

On April 26, 2018, Aviotti provided a Medical Source Statement in which she noted she saw Plaintiff weekly in group therapy. As noted, Aviotti found Plaintiff had PTSD and "can't

23 - OPINION AND ORDER

deal with people outside or inside his family and withdraws from their presence, highly anxious, vigilant, angry." Tr. 628. Aviotti stated Plaintiff has mild restrictions in his ability to understand and to remember simple instructions and to interact appropriately with supervisors; moderate restrictions in his ability to carry out simple instructions, to make simple work-related decisions, and to interact appropriately with the public and coworkers; and marked restrictions in his ability to understand and to remember complex instructions, to carry out complex instructions, to make complex work-related decisions, and to respond appropriately to usual work situations or to changes in routine work settings. Tr. 630-31. Aviotti did not answer the question that directed her to "identify the factors (*e.g.*, the particular medical signs, laboratory findings, or other factors described above) to support your assessment." Tr. 632.

The ALJ gave partial weight to Aviotti's letter and Medical Source Statement to the extent that the ALJ "included [in her evaluation of Plaintiff's RFC a] limitation to simple tasks with minimal changes in routine, and significant limitations in social interaction." Tr. 21. The ALJ gave "less weight" to that portion of Aviotti's opinions in which she indicated Plaintiff has "extreme functional limitations" because those limitations are not supported by "her own observations and mental status findings" or the record. For example, the ALJ noted Aviotti

prepared a Veteran Assessment report in August 2016 that
reflected largely normal mental-status findings, including
Plaintiff's ability to maintain concentration throughout the 60-
minute interview.  In addition, the record does not reflect
Plaintiff had any problems interacting with treatment providers,
and there is not any evidence from his previous employer that he
had psychological difficulties with his work situation.  As
noted, Plaintiff was not fired from his job as casino security
personnel.  Moreover, although Aviotti states Plaintiff "can't
deal with people outside or inside his family and withdraws from
their presence, highly anxious, vigilant, angry," the record
reflects Plaintiff improved with medication and therapy and he
reported visiting with friends and family, traveling to Las
Vegas, and going to USO concerts and a Toby Keith concert.

On this record the Court concludes the ALJ did not err when
she partially rejected the opinions of Aviotti because the ALJ
provided specific and legitimate reasons for doing so based on
substantial evidence in the record.

**IV.  The ALJ did not err when she gave less than "great weight"
to the VA determination that Plaintiff is disabled.**

Plaintiff contends the ALJ erred when she gave less than
"great weight" to the VA determination that Plaintiff is
disabled.

A Social Security disability determination is similar to a
VA disability determination in that both are made by federal

25 - OPINION AND ORDER

agencies that provide benefits to those who cannot work due to disability. *McCartey v. Massinari,* 298 F.3d 1072, 1076 (9th Cir. 2002). "[A]lthough a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 C.F.R. § 404.1504, the ALJ must consider the VA's finding in reaching his decision." *Id*. "[A]n ALJ must ordinarily give great weight to a VA determination of disability." *McCartey*, 298 F.2d at 1076. "Because the VA and SSA criteria for determining disability are not identical, however, the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id*. (citing *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001)(ALJ need not give great weight to a VA rating if he "adequately explain[s] the valid reasons for not doing so")).

At some point the VA found Plaintiff to be 60% disabled due to PTSD (50%) and "lumbosacral or cervical strain and tinnitus (together 10%)." Tr. 654. In June 2018 the VA increased Plaintiff's disability rating for PTSD to 70% and found Plaintiff to have a total disability rating of 100%.

The ALJ gave the VE rating "little weight" on the ground that it is not supported by the record. As noted, the record reflects Plaintiff's symptoms improved with therapy and medication; Plaintiff was able to travel and to attend concerts; and Plaintiff was able to understand and to remember simple

instructions, to perform simple tasks with minimal changes in routine, and to interact appropriately with supervisors.  In addition, Plaintiff engaged in group and individual therapy despite his claim that he was unable to leave his home, and his mental-health therapy records do not indicate any of the symptoms or limitations that were described in the V.A. findings.

On this record the Court concludes the ALJ did not err when she did not give "great weight" to the VA's disability determination because the ALJ provided "persuasive, specific, [and] valid reasons" to support her decision.

## CONCLUSION

For these reasons, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.

IT IS SO ORDERED.

DATED this 28th day of September, 2020.


/s Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge


27 - OPINION AND ORDER